HOPKINS BROTHERS COMPANY

*vs.*

AMERICAN RAILWAY EXPRESS COMPANY.

Aroostook.    Opinion December 11, 1925.

*In the transportation of live stock the carrier is bound to maintain, from point of shipment to point of destination, cars suitable for reasonably safe conveyance of its live freight.*

In the case at bar the jury found that defendant, or its agents, were negligent in their handling of the horses and car while the car was at Northern Maine Junction in this State, and the evidence justifies that finding.

The jury heard the evidence and it is assumed that they were properly instructed as to the element of negligence.   It is agreed that the cost of the horse found dead in the car at the Junction was not included in the verdict, but the jury must have included in the verdict the cost of the mare found lying on the floor of the car in a crippled condition.   The evidence seems to justify a finding that the crippling of the mare was due to her "condition," as the word is used in the contract of shipment, and to her own acts and that of the other animals, and that her loss is one of inevitable accident and not recoverable against the defendant.

On motion for a new trial by defendant.   An action of assumpsit to recover damages for not safely transporting a carload of horses from Watertown, Mass., to Fort Fairfield, Maine.   The horses were shipped under the usual contract for the transportation of live stock. On arrival of the car at Northern Maine Junction in this State, one of the horses was found dead and another in a serious condition, and within a week after the shipment reached Fort Fairfield six of the horses died from pneumonia, alleged to have resulted from exposure at the Junction due to the negligence of defendant.   A verdict of $1,251.43 was rendered for plaintiff and defendant filed a general motion for a new trial.   If plaintiff, within thirty days from filing of rescript, files a remittitur of all damages in excess of $1,086.43, motion overruled:    otherwise motion sustained and a new trial granted.

The case is fully stated in the opinion.
*Powers* v. *Mathews*, for plaintiff.
*Ryder & Simpson*, for defendant.

SITTING: WILSON, C. J., PHILBROOK, DUNN, DEASY, BARNES, BASSETT, JJ.

BARNES, J. The defendant, a common carrier of goods and chattels for hire, by its written contract with plaintiff, on March 6, 1924, undertook and agreed to transport twenty-eight horses from Watertown, Massachusetts, to Fort Fairfield, Maine. The contract is in the form in common use in the shipment of livestock, and for a complete understanding of the liabilities of the parties thereto need not be set out in full. Under the contract, however, the defendant agreed to furnish a suitable car, and did furnish an express car, sufficiently commodious, and of such construction as to protect its load from exposure so long as it was kept closed. It stipulated non-liability for damage to the horses arising from any "conduct or act of the animals to themselves, or to each other, . . . . or arising from the condition of the animals themselves, or which results from their nature or propensities . . . . for delay, injuries to or loss of said animals and paraphernalia, from any cause whatever, unless such delay, injury or loss shall be caused by the Express Company or by the negligence of its agent or employees." The plaintiff, by its president, a man of more than thirty years' experience shipping horses into Aroostook County, inspected the horses, himself taking the temperature of each, and substituting a horse carrying normal temperature for each beast that registered above normal.

He supervised the loading, signed the contract of shipment, and furnished an attendant who was privileged to ride and did ride in the smoking-cars of the railroads employed.

The car was transported with reasonable dispatch, except for an unavoidable delay at Northern Maine Junction, in this State, to destination, one horse, however, dying before arrival at the Junction, from causes attributable to what is termed in the contract his "condition." For the loss of this horse the defendant could not, under the contract, be held liable.

It is apparent that the defendant transported the car of horses by virtue of contracts with the various railroads over whose lines it

moved, contracts of whose nature there is no evidence in the case; but, so far as plaintiff's rights are concerned, the railroads employed by defendant in the transportation of the car were agents of the defendant.

After arrival at Fort Fairfield, between dates March 18 and March 22, six of the shipment of horses died.

Plaintiff claimed damages, to the amount of the purchase price of the six horses, on the ground that they died of pneumonia, following cold or influenza caught or aggravated by undue exposure resulting from negligence of defendant, or its agents, during the delay at Northern Maine Junction, and the Express Company defended, on the theory that the first to die at Fort Fairfield was a mare whose condition when found in distress at the Junction was such as to render her valueless, and without liability on its part, and that the other five died from the effect of disease to which horses in shipment are subject, called acclimating or shipping disease, or from other causes for which defendant is not liable.

Upon this issue the case was tried, and the result was a verdict for the plaintiff.

The case comes to this court upon motion, and the question for decision is whether the jury was justified in finding negligence on the part of the defendant, and, if so, whether or not the amount of the verdict is excessive.

There was evidence that the defendant had its agent, the express messenger, on the Maine Central train that moved the horses to Northern Maine Junction, for he testified that he accompanied the shipment to that point and turned the bill of lading over to the messenger of the connecting train, and further that he did not inspect the car and contents there, but had to put out express for the connecting train, and that from the Junction he went on to Bangor, not having seen the horses after leaving Waterville.

There was evidence that the defendant had its messenger on the connecting train at the Junction, and that he did not attend to the horses but went on to the end of his trip, leaving the car in the Junction yard.

There was evidence that the head transfer man at the Junction was in charge of matters concerning the defendant at the Junction, and that he had a crew there; evidence that two express men and helpers were about the car during the delay; that the yard-master

of the Bangor and Aroostook R. Co. was on duty with his crew at the Junction, and that the yard clerk, the car inspector of the B. & A., and others, noticed evidence, at the Junction, that the car of horses was received there in serious disorder.

The car was set for the Bangor and Aroostook train, but its conductor refused to receive it in the condition in which it was offered to him, and his train pulled out on its way northward, leaving the horses on the track. The attendant was notified and he testified fully what he attempted to do and what he was able to do for the horses during the delay, from two forty-seven A. M. until about seven o'clock, when the car was connected and moved out with the next regular train for Fort Fairfield.

The jury found that defendant, or its agents, were negligent in their handling of horses and car during this period of about four hours, and the evidence justifies that finding.

It was the duty of defendant to maintain throughout the trip a car suitable for reasonably safe conveyance of its live freight.

Notified that two of the horses were down on the floor of the car, under the feet of their mates in the rear compartment, the men in charge of the yard at the Junction, agents of defendant, determined, as was their duty, to refit the car for further passage by retaining it and causing or allowing the fallen and helpless beasts to be removed therefrom. All witnesses agree that the horses were pounding and trampling within, and were hot and steaming, as horsemen say.

The car was moved over to the stock yard, and regular employees at the Junction opened the car, removed to the unsheltered yard the horses that were standing, found one dead horse on the floor, and another so grievously crippled that, after working over her for a half hour or more, they abandoned their attempt to get her on her feet.

It was a March morning, the temperature at about the freezing point, and the attendant was busied in keeping the unloaded animals moving about the yard, with the purpose of safeguarding them from injury by exposure to the cold air while in their heated condition.

He had protested against unloading them in the cold, had urged that the car be taken in to Bangor, and had wired to that city for the services of a veterinarian.

In disregard of the suggestions and recommendations of the attendant, during the interval from about three till nearly seven o'clock,

the employees of the railroad or of the express company, or, more likely, employees of both companies acting together, at various times proceeded to put the car into reasonable condition to again receive the unloaded horses and go on its way. During all this time, so far as the evidence shows, the door of the car was left open and the horses in the middle and forward compartments were subjected to the inrush of cold air.

When delivered to the shipper at Fort Fairfield, six of the horses so exposed as above set forth, were found to be ailing, sickened, and in the space of fifteen days, though ministered to by a veterinarian, died.

The jury heard the evidence. It is assumed they were properly instructed as to the element of negligence. They found the defendant, or its agents, negligent, and were so far right. It is agreed that they did not include in the amount of their verdict the cost of the horse found dead in the car at the Junction. They must have included the cost of the mare that lay on the car floor in crippled condition. The evidence seems to justify a finding that the crippling of the mare was due to her "condition," as the word is used in the contract of shipment, and to her own acts and that of the other animals, and that her loss is one of inevitable accident and not recoverable against the defendant.

Some testimony was given as to the value of the animals at loading point. The jury, in estimating this value, may have considered that the loss of one horse, out of a pair, bought as a pair, was more than one half the cost of the pair. They brought in a verdict for $1,251.43.

The pair, of which the crippled mare was one, cost plaintiff $330.

*If plaintiff, within thirty days from filing of rescript, files a remittitur of all damages in excess of $1,086.43, motion overruled; otherwise motion sustained and a new trial granted.*